**SUBMITTED TO CSO AND CLEARED FOR PUBLIC FILING**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AHMED BEN BACHA (BELBACHA)**, ) | |
| ) | |
| *Petitioner*, ) | |
| ) | Civil Action No. 05-2349 (RMC) |
| *v.* ) | |
| ) | |
| **GEORGE W. BUSH**, *et al.*, ) | |
| ) | |
| *Respondents*. ) | |
| ) | |

**PETITIONER'S OPPOSITION TO RESPONDENTS' MOTION TO DISMISS AND
MOTION FOR STAY-AND-ABEY ORDER OR, IN THE ALTERNATIVE, FOR
TRANSFER**

Petitioner Ahmed Belbacha, through his counsel, hereby opposes Respondents'

Motion to Vacate the District Court Orders and Dismiss the Habeas Petitions for Lack of

Jurisdiction.  Instead of dismissing this case and vacating the orders, Petitioner respectfully

requests that this Court, in the interests of justice: (1) stay the dismissal of this habeas action

while Petitioner exhausts his remedies in the Court of Appeals under the Detainee Treatment

Act of 2005, Pub. L. No. 109-148, 119 Stat. 2680 ("DTA"), and (2) hold this action in

abeyance pending Petitioner's exhaustion of those remedies and the resolution in the

Supreme Court of a renewed petition for certiorari to review the Court of Appeals'

jurisdictional holding in *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007) ("*Boumediene

I*"), or the Supreme Court's resolution of the same jurisdictional issue as presented in a

pending original habeas petition in *In re Ali*, No. 06-1194.

If this Court declines to enter this order, Petitioner requests in the alternative that this

Court stay dismissal of the habeas petition for the later of 1) sixty days, pending the filing of

Petitioner's DTA action, or 2) the Court of Appeals' determination as to what procedures

should govern in such cases.  If this Court determines that it lacks jurisdiction to grant the

**SUBMITTED TO CSO AND CLEARED FOR PUBLIC FILING**

relief requested (which Petitioner respectfully suggests would be premature), then it should

transfer the habeas action to the Court of Appeals pursuant to 28 U.S.C. § 1631, for

consolidation with Petitioner's forthcoming DTA action.

The government's blanket motion to dismiss every Guantánamo habeas petition—

and to jettison the interlocutory orders that give the Guantánamo prisoners the most

rudimentary of legal rights—is premature, unwarranted, and will be deeply prejudicial to *any*

proceedings to be pursued in the future by Petitioner, including his forthcoming action under

the DTA.  The D.C. Circuit has not yet issued its mandate in *Boumediene I*.  Even after the

mandate issues, this Court retains discretion to stay this action while Petitioner exhausts

remedies under *Rhines v. Weber*, 544 U.S. 269, 276 (2005).

It is crucial that the interlocutory orders entered in this case be preserved.  To do so

works no harm on Respondents, but letting them lapse will seriously prejudice Petitioner's

ability to seek relief in this or in any other court.  The orders are the sole safeguard of

Petitioner's right to meet and communicate with his attorney.  Respondents are now

attempting to bar habeas counsel from seeing their clients unless they agree to a new, and

much more restrictive, protective order.[1]  Without the orders, counsel will also be unable to

contest any transfer to Petitioner's home country of Algeria, where he faces a high

probability of persecution, including possible torture or execution.  This situation is not

speculative—in fact, it appears to be underway.  Clint Williamson, the Ambassador At Large

for War Crimes Issues, was reportedly in Algiers last week negotiating for the repatriation of

at least seven Algerian prisoners.[2]  Respondents have refused to disclose the names of the

prisoners under consideration, but Mr. Belbacha is presumably included in the list, as he is

cleared for release.

---

[1] See "U.S. Asks Court to Limit Lawyers at Guantánamo," New York Times, April 26, 2007, *available at*
[2] *See* "Sept Algériens bientôt extradés," L'Expression, April 23, 2007, *available at*
*http://www.lexpressiondz.com/T20070423/ZA4-4.htm.*

**SUBMITTED TO CSO AND CLEARED FOR PUBLIC FILING**

What is more, the Amended Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantánamo Bay, Cuba ("Protective Order") mandates the destruction of all protected documents sixty days after the final termination of this action and any appeals therefrom. Negotiating a new protective order for the DTA proceedings that provides the same level of client access and protects the attorney-client privilege could take longer than this. Materials crucial to Petitioner's DTA petition may be lost unless this case is stayed.

Petitioner is not attempting to continue to litigate this habeas case, as Respondents have suggested. He requests no ruling on the merits of his habeas petition at this time. He merely asks that this Court preserve the status quo while the fundamental jurisdictional issues posed by the MCA continue to be litigated in the courts above—or, at the very least, until a system is adopted in the D.C. Circuit to govern such critical matters as access to classified materials, preservation of documents, client visitation and communications, and protection against Petitioner's transfer to Algeria during the pendency of the DTA action.

1. **Dismissal Is Premature Because The Jurisdictional Questions Posed By This Action Are Still Live.**

This matter has been stayed since January 27, 2006, aside from a brief lift of the stay on Petitioner's motion on August 4, 2006, for purposes of entering the Protective Order. On February 20, 2007, a divided panel of the Court of Appeals ruled that the Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, 120 Stat. 2600, stripped the federal courts of jurisdiction over habeas actions brought by foreign nationals held at Guantánamo.[3] *Boumediene v. Bush*, 476 F.3d 981 at 988 (D.C. Cir. 2007) ("*Boumediene I*").

Dismissal of this action is premature because five members of the Supreme Court have signaled that they will likely revisit *Boumediene I* after Petitioners have completed DTA

---

[3] The Court of Appeals has not issued its mandate in *Boumediene I*. The *Boumediene* petitioners have asked the Court to stay the issuance of its mandate pending the completion of DTA proceedings and the filing of a renewed petition for certiorari to review the D.C. Circuit's jurisdictional ruling in *Boumediene I*. The Court of Appeals has not yet acted on the motion.

proceedings.  On March 5, 2007, the *Boumediene* petitioners appealed to the Supreme Court

for a writ of certiorari, and on April 2, 2007, the Supreme Court denied their request.

However, three Justices dissented from the denial, and two others explained that, despite "the

obvious importance of the issues raised in these cases," it was "appropriate to deny these

petitions *at this time*" to require the petitioners to exhaust their DTA remedies.  *See*

*Boumediene v. Bush*, 127 S. Ct. 1478 (2007) ("*Boumediene II*") (statement of Stevens and

Kennedy, JJ.) (emphasis added).

The denial of certiorari in *Boumediene II* emphatically does not require dismissal of

this action.  Respondents' argument to the contrary ignores that "as always, denial of

certiorari does not constitute an expression of any opinion on the merits." *Id.* (citing *Rasul*,

542 U.S. at 480-81).   More importantly, the statement of Justices Stevens and Kennedy calls

not for dismissal, but for *exhaustion*, citing *Ex Parte Hawk*.  321 U.S. 114 (1944).  That

citation is telling.

In *Hawk*, the petitioner filed for federal habeas corpus relief under circumstances, as

in the present case, in which the effectiveness of other remedies had not been established.

The Supreme Court held that the adequacy of the available remedy should be decided in the

first instance by "the federal district court":

> Where the state courts have considered and adjudicated the merits of his
> contentions, and this Court has either reviewed or declined to review the state
> court's decision, a federal court will not ordinarily reexamine upon writ of
> habeas corpus the questions thus adjudicated . . . .  But where resort to state
> court remedies has failed to afford a full and fair adjudication of the federal
> contentions raised, either because the state affords no remedy . . . or because
> in the particular case the remedy afforded by state law proves in practice
> unavailable or seriously inadequate . . . , a federal court should entertain his
> petition for habeas corpus, else he would be remediless.  In such a case he
> should proceed in the federal district court before resorting to this Court by
> petition for habeas corpus.

321 U.S. at 118 (citations omitted).  The exhaustion model anticipates that the jurisdictional

questions—questions that turn on the efficacy of the DTA remedy—will first be considered

**SUBMITTED TO CSO AND CLEARED FOR PUBLIC FILING**

and decided in the District Court.  The issues would then be preserved for appellate and

Supreme Court review, if necessary. [4]

As always, this Court has jurisdiction to determine its own jurisdiction.  *Kircher v.*

*Putnam Funds Trust*, 126 S.Ct. 2145, 2155 (2006) (a federal court's adjudicatory authority

includes "its authority to determine its own jurisdiction"); *see also Ex parte Milligan*, 71 U.S.

2, 118, 131 (1866) (Court reviewed the underlying facts to determine that the predicates for

military jurisdiction were lacking and granted writ of habeas corpus).  At this time, however,

this Court has insufficient information to answer a number of questions the DTA proceedings

will address.   Is the review provided by the DTA coextensive with traditional habeas corpus?

If not, has the writ been unconstitutionally suspended or eliminated?  Is the government

taking "additional steps to prejudice the position of Petitioners in seeking review of this

Court" and, if so, should this Court "act promptly to ensure that the office and purposes of the

writ of habeas corpus are not compromised"?  *Boumediene II*, 127 S. Ct. 1478 (statement of

Stevens and Kennedy, JJ.)

In short, further developments will shortly clarify the status of this action.  A majority

of the Supreme Court has indicated that it may reverse *Boumediene I* if the DTA proceedings

prove to be an inadequate substitute for habeas.  *See Swain v. Pressley*, 430 U.S. 372 (1977).

Alternatively, the Supreme Court may resolve those questions in a pending original habeas

petition in *In re Ali*, No. 06-1194.[5]  The prudent course in the meantime is for this Court to

preserve Petitioner's habeas petition pending the final resolution of the DTA litigation in the

appellate courts, including further Supreme Court review of the MCA jurisdictional issues.

---

[4] Because Petitioner must proceed first in this Court after exhausting his remedies, dismissal of this Petition will leave an inadequate record for appellate and Supreme Court review in the event he loses on the merits after exhaustion.  The government should be foreclosed from prejudicing the Petitioner's ability to litigate—at the District Court or Circuit Court level—these questions of obvious and historic importance.

[5] *In re Ali* directly challenges the MCA jurisdictional holding of the Court of Appeals.  Under the Supreme Court's posted schedule, the *In re Ali* papers are expected to be distributed for consideration at the Court's Conference on May 17, 2007.

SUBMITTED TO CSO AND CLEARED FOR PUBLIC FILING

**2. Under *Rhines v. Weber* , This Court Should Stay-and-Abey These Habeas Proceedings While Petitioners Exhaust the DTA Remedy.**

"District courts . . . ordinarily have authority to issue stays, *see Landis v. North American Co.*, 299 U.S. 248, 254 (1936), where such a stay would be a proper exercise of discretion, *see Clinton v. Jones*, 520 U.S. 681, 706 (1997)." *Rhines v. Weber*, 544 U.S. 269, 276 (2005). In *Rhines v. Weber*, the Supreme Court held that where a habeas petitioner has failed to exhaust all available remedies in state court, a federal court retains discretion to keep jurisdiction over the pending habeas petition, staying the action and allowing exhaustion of remedies in the state courts rather than dismissing the petition. *Rhines*, 544 U.S. at 277.

Respondents attempt to minimize the significance of *Rhines* by stating that the Guantánamo habeas cases, unlike *Rhines*, do not involve "any temporal bar to a habeas petition," and by admonishing that the "authority of a court to enter a stay is constrained by statute." Respondents' Motion to Dismiss at 7. However, Respondents fail to note that the constitutionality of the operative statute in *Rhines* (the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")) was not being actively litigated as part of the habeas petition, as it is here. The constitutional validity of the DTA's substitute scheme remains very much in doubt.

In fact, the *Rhines* court indicated that certain circumstances make a stay-and-abey order virtually mandatory. The Court found that, absent purposeful delay by the Petitioner, "it would likely be an abuse of discretion to deny a stay and to dismiss" a petition if the petitioner has good cause for the failure to exhaust and the unexhausted claims are potentially meritorious. *Rhines*, 544 at 278; *accord Pace v. DiGuglielmo*, 544 U.S. 408, 416-17 (2005). The conditions under which failure to stay-and-abey constitute an abuse of discretion—no deliberate delay, good cause, and potentially meritorious claims—are present in this case.

First, Petitioner has done nothing to delay and everything to accelerate this case. Counsel submitted a petition for habeas corpus relief on December 8, 2005. The stay that has

**SUBMITTED TO CSO AND CLEARED FOR PUBLIC FILING**

kept his petition from proceeding on the merits issued *sua sponte* from this court on January 27, 2006, over fourteen months ago. Because the government objected to Mr. Belbacha's next friend, Binyam Mohammed, counsel for Petitioner had to locate Mr. Belbacha's father, Salah Belbacha, in Algeria in order to meet Petitioner in Guantánamo and begin the process of representation. Afterwards, Petitioner moved in June 26, 2006 to lift the stay for entry of the Protective Order and to secure an initial meeting with Mr. Belbacha to prepare his case. In his pleadings, the Petitioner has invoked the need for habeas relief to be prompt. *See Carafas v. La Vallee*, 391 U.S. 234, 238 (1968) (habeas writ, "shaped to guarantee the most fundamental of all rights, is to provide an effective and speedy instrument by which judicial inquiry may be had into the legality of the detention of a person"). It would simply make no sense for Petitioner to engage in the "intentionally dilatory litigation tactics" that concerned the Supreme Court in *Rhines*—for a prisoner in Guantánamo, every day of delay is disastrous. 544 U.S. at 279 (Stevens, J., concurring, joined by Justices Ginsburg and Breyer).

Second, there is good cause for the failure to exhaust the DTA remedy. The Supreme Court has said that potential confusion regarding state remedies requires equitable protections. *Pace*, 544 U.S. at 416. The complexities in standard state habeas pale in comparison to the legal and practical morass that Petitioner, as a Guantánamo prisoner, must overcome to seek relief in any forum. He is held virtually incommunicado; the American legal system is foreign to him; and the government made it extraordinarily difficult for counsel to meet with him. When he finally did obtain counsel, the government actively interfered with his attorney-client relationship. The manipulative behavior of military officials, geared to undermine prisoners' trust in their lawyers, is detailed in an attached affidavit by Clive Stafford Smith at Exhibit A (discussing how the military discourages prisoners' meeting with counsel; how prisoners have been placed in solitary on days they met

**SUBMITTED TO CSO AND CLEARED FOR PUBLIC FILING**

with their lawyers and sometimes days before; how interrogators have impersonated lawyers; and similar tactics.)

Moreover, the state of the Petitioner's statutory rights has been in constant flux from *Rasul v. Bush*, 542 U.S. 466 (2004), to the present. The DTA review process did not exist until *after* this habeas corpus petition was filed, and it did not purport to provide the habeas relief to which the Petitioner was then entitled. *Hamdan v. Rumsfeld* held that the DTA's jurisdiction-stripping provisions did not apply to pending habeas petitions, meaning the DTA remedy was inappropriate then. *Hamdan v. Rumsfeld*, 126 S.Ct. 2749, 2762-69 (2006). The MCA retrospectively applied those provisions to Petitioner, raising serious Constitutional questions under the Suspension Clause. On April 2, 2007, the Supreme Court deferred review of those questions pending exhaustion. Therefore, Petitioner had excellent reasons for not initiating the DTA procedures until the denial of certiorari in *Boumediene*.

Third, Petitioner's claims, both in this Court and to be raised in the DTA petition, are meritorious. On February 22, 2007, counsel received notice from the Government that Mr. Belbacha had been cleared for release. The extraordinary factual development in his case establishes that Mr. Belbacha was seized in Pakistan, rendered by the CIA to Kandahar, where he suffered beatings and other physical abuse, and has continued in his time at Guantánamo to endure numerous violations of the Department of Defense's own standards and procedures, the laws and Constitution of the United States, and international law, including the Geneva Conventions. Despite Respondents' suggestions to the contrary in their notification of release to counsel, the Petitioner would not have been cleared if he constituted a threat to the United States.

The Petitioner, in short, has already "won" his case to the U.S. Government. He remains in Guantánamo today simply because diplomatic arrangements for his transfer have not been made with his country of citizenship, Algeria—where he faces likely persecution by

**SUBMITTED TO CSO AND CLEARED FOR PUBLIC FILING**

armed insurgent groups, the government, or both.  Nor has the United Kingdom, where Mr

Belbacha lived, worked, and had permanent leave to remain, agreed to accept his repatriation.

In the event the case is remanded, or if the DTA procedures prove an inadequate substitute

for constitutionally-required habeas corpus procedures, this Court should be in position to

proceed immediately on the issues raised and briefed in the pending habeas petition to grant

Mr. Belbacha relief as expeditiously as possible.  Justice requires that he be released from

Guantánamo to a country where he will be safe.

Under the controlling authority of *Rhines*, the Court should enter an order staying the

case, as it has been stayed to date, and holding the disposition of the merits in abeyance

pending the outcome of the forthcoming *Petition For Immediate Release And Other Relief*

*Under The Detainee Treatment Act Of 2005*.

3. **This Court Retains Jurisdiction Under *Steel Co.* Because Petitioners' Claims Are Not Frivolous and Have Not Been Decided on the Merits by the Supreme Court.**

Respondents' motion relies chiefly on a misreading of *Steel Co. v. Citizens for a*

*Better Environment*, 523 U.S. 83, 89 (1998).  The starting point of *Steel Co.* is that the

District Court has subject matter jurisdiction as long as there is a non-frivolous argument that

the laws and Constitution support the claim:

> [T]he district court has jurisdiction if 'the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another.'  . . . unless the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous.'

523 U.S. at 89 (quoting *Bell v. Hood*, 327 U.S. 678, 682-83, 685 (1946)).  As demonstrated

by the dissenting opinions in *Boumediene I* and concurring opinion respecting the denial of

certiorari in *Boumediene II*, there is a reading of the Constitution and laws of the United

States that would sustain this habeas corpus petition. 476 F.3d at 994-1012 (Rogers, J.,

dissenting); 127 S.Ct. at 1479-81 (Breyer, Souter & Ginsburg, JJ., dissenting from denial of

certiorari); 127 S. Ct. 1478 (statement of Stevens and Kennedy, JJ.)

The *Steel Co.* opinion also establishes that a Circuit Court opinion, such as

*Boumediene I*, is not sufficient to deprive the Court of subject-matter jurisdiction.[6]  Only

when the Supreme Court rules adversely on the merits is dismissal for want of subject matter

jurisdiction appropriate: "Dismissal for lack of subject-matter jurisdiction because of the

inadequacy of the federal claim is proper only when the claim is 'so insubstantial,

implausible, *foreclosed by prior decisions of this Court*, or otherwise completely devoid of

merit as not to involve a federal controversy."  *Id*. (quoting *Oneida Indian Nation of N.Y. v.

County of Oneida*, 414 U.S. 661, 666 (1974)(emphasis added)).  The *Boumediene* denial of

certiorari is not a ruling on the merits.  *Boumediene II*, 127 S. Ct. 1478 (2007) (statement of

Stevens and Kennedy, JJ.)  A close reading of *Steel Co*. actually *confirms* that Respondents'

motion to dismiss should be denied pending Petitioners' exhaustion of remedies.

4.  **Under *United Mine Workers*, the Court Has Jurisdiction to Preserve the Status Quo While Jurisdictional Questions Are Litigated.**

In the statement accompanying the *Boumediene* order, Justices Stevens and Kennedy

cautioned: "Were the Government to take additional steps to prejudice the position of

petitioners in seeking review in this Court, 'courts of competent jurisdiction,' including this

Court, 'should act promptly to ensure that the office and purposes of the writ of habeas

corpus are not compromised.'"  127 S.Ct. 1478 (2007) (statement of Justices Stevens and

---

[6] Respondents' reliance on a concurring opinion from *Ayuda v. Thornburg*, 919 F.3d 153 (D.C.Cir. 1990)("*Ayuda II*"), cited for the proposition that "once an opinion is released it becomes the law of this Circuit," is similarly unavailing. Resps' Mot. at 3-4 n. 5.  In *Ayuda II*, the government requested that the D.C. Circuit grant a stay of a District Court order issued during a protracted series of appeals over the interpretation and constitutionality of the Immigration Reform and Control Act of 1986, 100 Stat. 3359 (1986).  The dispute in *Ayuda II* arose because the D.C. Circuit had issued a ruling that the District Court lacked jurisdiction to enter a *different* order in the litigation, calling into question whether there was jurisdiction to enter the order in *Ayuda II*.  *Ayuda v. Thornburg*, 880 F.2d1325, 1329, 1346 (D.C. Cir. 1989)("*Ayuda I*").  The Supreme Court then granted certiorari in *McNary v. Haitian Refugee Center*, cert. granted 496 U.S. 904 (1990), which posed the identical jurisdictional issue.  Critically, the majority in *Ayuda II* did not order the District Court to vacate the order or dismiss the action, as the concurrence Respondents cite would have done—it simply granted a stay while the Supreme Court heard and resolved *McNary*.

SUBMITTED TO CSO AND CLEARED FOR PUBLIC FILING

Kennedy). The Justices' language echoes the long-established principle that, in the face of an argument that a court lacks jurisdiction, that ultimate question is for the Supreme Court alone. While the matter is under consideration, the lower courts have "authority from the necessity of the case to make orders to preserve the existing conditions and subject of the petition." *United Mine Workers*, 330 U.S. at 291 (quoting United States v. Shipp, 203 U.S. 563, 573 (1906) (Holmes, J.)).  This Circuit has not hesitated to apply these principles:

> Of course, whether or not there was jurisdiction to decide the merits, until the question of jurisdiction is determined, there was "authority from the necessity of the case to make orders to preserve the existing conditions and the subject of the petition…."…Clearly there was "power to preserve existing conditions while…determining [the] authority to grant injunctive relief."

*In re President and Directors of Georgetown College*, 331 F.2d 1000, 1005 (D.C. Cir. 1964) (quoting United Mine Workers).  This Court should carefully protect the status quo by maintaining the orders entered to date to assure the petitioners are not prejudiced in their ability to litigate the DTA action; to preserve potential remedies in the District Court and on appeal; and to protect Petitioner's safety and life.

   5. **Failure to Maintain the Status Quo Will Severely Prejudice Petitioner's Ability to Seek Relief In Any Forum.**

   The harms Petitioner fears if the Protective Order is vacated are not speculative—they are either imminent or already underway.  Losing his right to see a lawyer, having that right so restricted as to be meaningless, or facing transfer to persecution in Algeria all plainly prejudice Petitioner's right to relief in any forum.  Without swift remedial action by this Court, the "office and purposes of the writ of habeas corpus" *will* be compromised.  127 S.Ct. 1478 (2007) (statement of Justices Stevens and Kennedy).

   Respondents are not awaiting resolution of their motions to dismiss to interfere with counsel access.  The government has indicated in e-mail communications with habeas counsel that it intends to bar visits to prisoners unless counsel acquiesces in the new

**SUBMITTED TO CSO AND CLEARED FOR PUBLIC FILING**

"protective order" they have proposed.  The regime Respondents have requested in the D.C.

Circuit permits government officials to read attorney-client communications and caps the

number of visits at three, after which the prisoner may be forever barred from seeing an

attorney, whether he remains in Guantánamo for two months or twenty years.  Aside from

being totally unnecessary, this proposal will undermine both the DTA action and the habeas

litigation.

The essence of the attorney-client relationship is that a lawyer meets with his client to

develop as strong a factual basis as possible in support of his client's case.  Under the ethical

rules, the client must have the opportunity to participate in his own representation: to advise

the attorney of relevant facts, to provide direction in the litigation, and to participate in

tactical and strategic decisions.  Three visits with a client would strain the limits of a lawyer's

ethical duty in the best of circumstances—in the shadowy world of Guantánamo, it will

effectively destroy any working attorney-client relationship.  The government has advanced

no convincing justification for modifying the current regime.[7]  As detailed in the attached

affidavit of Clive Stafford Smith, *see* Exhibit A, the government has made it enormously

difficult to represent prisoners in Guantánamo effectively.  A lapse in those interactions,

followed by the more restrictive regime Respondents have proposed, will completely erode

the client's confidence in his attorneys.   It will be all but impossible for counsel to prepare a

DTA petition properly in such circumstances.

If the access regime proposed by the government fails to protect the core duties of an

attorney to his client, it bars outright the other functions an effective lawyer is meant to serve.

For example, under the new regime, lawyers will lack both the time and the requisite

---

[7] While the government has railed against the "difficulties" caused by the presence of lawyers at the base, they apparently never moved for the modification of the Protective Order at the Disrtict Court level.  Moreover, the government's pleading in the D.C. Circuit seeking a more restrictive regime for DTA actions relies chiefly on a Declaration from Commander Patrick M. McCarthy that is composed entirely of hearsay—and six of the seven "situations" it describes predate Commander McCarthy's presence at Guantánamo. *See* Addendum A to Government's Motion for Entry of Protective Order, *Bismullah v. Gates*, No. 06-1197 (D.C. Cir April 9, 2007).

**SUBMITTED TO CSO AND CLEARED FOR PUBLIC FILING**

confidentiality to discuss conditions of confinement, abuse, and fears of persecution in a prisoner's home country with the prisoner. Pigeonholed into discussing nothing but the government's allegations against the prisoner, lawyers will be indistinguishable from the prisoners' interrogators.

What is more, all of these changes will unfold in an environment calculated to rob prisoners of all hope. Petitioner's conditions of confinement, combined with his prolonged imprisonment without charge or trial, have steadily worn down his mental health and his belief that he will ever receive a fair hearing in U.S. custody. With only three further chances to meet with his lawyer—ever—and without the requisite privacy to confide in him, Petitioner's mental anguish will increase immeasurably, with serious and potentially fatal consequences.

Finally, as noted above, Petitioner is cleared for release, and counsel are gravely concerned that the government will seek to transfer him to his home country of Algeria—a country he fled in 1999 because of the death threats he received from armed Islamist groups. While no 30-day notice order protects the transfer of Mr. Belbacha, under the current regime, counsel can meet with him to collect evidence to support a claim for asylum. The government has not disclosed the identities of the Algerians slated for transfer in last week's negotiations between Clint Williamson and the Algerian government, but Mr Belbacha is cleared for release and would presumably be towards the top of the list of Algerians. *See supra* note 2. Counsel fear that, if the Protective Order in Mr Belbacha's case lapses, counsel will have no opportunity to object or to demonstrate to this Court that Petitioner cannot safely return to Algeria, and that to transfer him there would constitute a violation of the U.S.'s nonrefoulement obligations under the Convention Against Torture, adopted December 10, 1984, 1465 U.N.T.S. 85 (entered into force June 26, 1987). Leaving aside the obvious

**SUBMITTED TO CSO AND CLEARED FOR PUBLIC FILING**

prejudice to Petitioner's habeas action, a transfer to Petitioner's home country poses a grave threat to his liberty, his safety, and his life.

The government has already demonstrated its willingness to transfer individuals to countries known to practice torture. As explained in an attached affidavit of Clive Stafford Smith, *see* Exhibit B, Respondents transferred Mohammed Al-Rimi (ISN 194) to Libya, despite the fact that the Libyan agents who visited him at Guantánamo had threatened him with torture and execution. Mr. Al Rimi made his fears known to his fellow prisoners and to the U.S. authorities, but he was nonetheless given back to the Libyans. Al Rimi's whereabouts are presently unknown.

Under the existing system of interlocutory orders, it is possible, though difficult, for counsel to represent Petitioner and to try to protect him from harm in emergencies, such as Petitioner's transfer to a country that will torture or kill him. Letting those orders lapse will leave the attorney-client relationship in tatters, and will leave Petitioner's fate entirely in the hands of Respondents.

**6. In the Alternative, the Court Should Stay Dismissal Of Petitioner's Habeas Petition For At Least Sixty Days.**

Petitioner requests that should this Court decline to issue the requested stay and abey order, in the alternative, this Court should stay dismissal of the habeas petition for the later of 1) sixty days, or 2) until the Circuit Court determines what procedures will govern counsel access, document protection, and similar issues in the context of DTA proceedings. By this motion, Petitioner seeks to avoid a "procedure gap" between a dismissal in this court and the time when the Circuit Court institutes a regime to govern DTA actions.[8]

---

[8] Petitioner notes that a stay for sixty day should be sufficient because a motion to establish a protective order in DTA actions is pending before the Court of Appeals in *Bismullah v. Gates,* No. 06-1197, and *Parhat v. Gates,* No. 06-1397. Briefing in those appeals is nearly complete, and argument is scheduled for May, 15, 2007. In addition, a motion to proceed with DTA review is also pending in the Court of Appeals in *Paracha v. Gates*, No. 06-1038. On April 11, 2007, the Paracha panel issued an order setting a briefing schedule, calendaring argument for September 27, 2007, and directing the parties in their briefs "to take into account the court's disposition of [*Bismullah* and *Parhat*] in addressing issues related to discovery and this court's scope of review."

**SUBMITTED TO CSO AND CLEARED FOR PUBLIC FILING**

As this Court is aware, the Protective Order currently in place provides that sixty days after final resolution of this action, and the termination of any appeals therefrom, all protected documents or information and any copies thereof shall be promptly destroyed.  Those documents are necessary for the prosecution of a DTA action.  Unless these procedural orders remain in place, at least until the Court of Appeals enters an order preserving these documents, vital items to Petitioner's case may be lost forever.

As described above, the Protective Order also sets out a framework for attorney-client communications, the interruption of which would severely prejudice the DTA action, the habeas litigation, the ability of Petitoner's attorneys to function effectively, and the attorney-client relationship.

For these reasons, continuation of the Protective Order for the later of 1) a sixty day period, or 2) until the establishment of new procedures in Petitioners' DTA actions is necessary under the circumstances to prevent substantial injustice.

7.  **In the Event This Court Determines It Lacks Jurisdiction, Petitioner's Case Should Be Transferred to the Court of Appeals Pursuant to 28 U.S.C. 1631.**

If the Court nevertheless finds that it lacks jurisdiction to hear this case and declines to enter a stay, it should transfer the habeas action to the Court of Appeals for consolidation with Petitioner's forthcoming DTA petition.  The transfer statute provides in relevant part:

> Whenever a civil action is filed in a court…or appeal…is noticed for or filed with such a court and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it was transferred.

28 U.S.C. § 1631.  As described above, it is in the interest of justice for this Court to ensure that the current Protective Order remains in place, thus maintaining counsel's unbroken

SUBMITTED TO CSO AND CLEARED FOR PUBLIC FILING

access to evidence needed to prepare the DTA petition and giving Petitioners an opportunity to participate in the preparation of their DTA submissions, pending the Court of Appeals' decision on how to govern these proceedings.[9] It is also in the interest of justice to preserve the status quo, where the Court of Appeals has jurisdiction over the same general subject matters, and must consider issues of client access and the scope of merits review, but has not yet had the opportunity to act.  Under the circumstances, including the uncertain and shifting scope of federal court jurisdiction, this Court should, at a minimum, ensure that there is no gap in governing procedures until the D.C. Circuit can fully consider these matters in *Bismullah v. Gates,* No. 06-1197, and *Parhat v. Gates,* No. 06-1397.

### Conclusion

For the foregoing reasons, Respondents' motion should be denied, and this Court should enter an order preserving the status quo by continuing its stay of litigation going to the merits of the pending petition for a writ of habeas corpus and holding such litigation in abeyance pending the outcome of the Petitioner's forthcoming *Petition For Immediate Release and Other Relief Under The Detainee Treatment Act of 2005*.

RESPECTFULLY SUBMITTED,

May 1, 2007.

Zachary Katznelson
California Bar No. 209489
Reprieve
P.O. Box No. 52742
London, England EC4P 4WS
+44 207 353 4640 (phone)
+44 207 353 4640 (fax)
zachary@reprieve.org.uk

Counsel for Petitioners

---

[9] The Government has taken the position in the Court of Appeals and in this Court that the detainees' habeas corpus cases should be transferred pursuant to 28 U.S.C. § 1631, and has cited legislative history of the DTA that it suggests supports such transfer.  *E.g., Al Odah v United States*, Nos. 05-5064, 05-5095 through 05-5116, Nos. 05-5062, 05-5063, Reply of Federal Parties Addressing the Detainee Treatment Act of 2005, at 28-31 (D.C. Cir. Mar. 17, 2006) (citing comments of Senator Graham, *inter alia*); *Hamdan v. Rumsfeld*, Civil Action No. 1:04-cv-01519-JR, Respondents' Reply in Support of Motion to Dismiss, at 45 n. 24 (D.D.C. Dec. 8, 2006).