Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

# EXHIBIT A

LONDON, ENGLAND

## DECLARATION OF CLIVE A. STAFFORD SMITH

COMES NOW, CLIVE A. STAFFORD SMITH, being sworn, and hereby states as follows:

1. I am a member of the bars of Georgia, Louisiana and Mississippi, as well as of the United States Supreme Court and various among the lower federal courts.

2. I make this declaration concerning the need for appropriate and full legal access to our clients in Guantanamo Bay.

3. Everything I write in this affidavit is unclassified or not subject to the classification procedure.

4. The Military in these cases has recently filed to dismiss the habeas cases brought by various prisoners in the District Court, and to seek this Court's permission to impose new, very restrictive measures on counsel access. Such measures are neither appropriate nor necessary.

5. The Military's position is difficult to accept for a number of reasons. I should note, however, that I do not mean anything I write as a personal criticism of the military personnel, who are working to fulfil a task that is made impossible by those making policy in Washington D.C. The actions of the personnel who search or escort the lawyers have sometimes been unreasonable, but that is normally because they have been trying to enforce rules that make little sense.

6. I should state that although, after more than two years' experience, I view some of the Military's rules as unnecessary, often irrational, and occasionally as barring the disclosure of criminal acts on behalf of U.S. personnel, I have attempted to comply with them at all times. On some occasions – such as the submission of my entire book to the U.S. military for review and censorship -- I have also gone beyond the requirements, simply for the sake of avoiding any argument. That said, it ill-serves the U.S. system of government to impose censorship rules that are not necessary or that are implemented for illegitimate purposes.

7. The Government's argument for the application of this novel protective order may be divided into two broad areas: access to clients, and censorship procedures.

## I. Access to Clients and Building a Meaningful Attorney-Client Relationship

1

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

# EXHIBIT A

8.   The Government's argument for changing the procedure for access to clients is stated in the motion:

> "The protective order in the district court also did not adequately address the procedures to govern initiation of a suit by a detainee. Many habeas cases have been filed by purported 'next friends' of detainees; counsel for those 'next friends' then sought to visit the detainee on multiple occasions in an attempt to obtain representation authorization. These visits were sought even though detainees had been clearly notified (in their native language) of their ability to file a habeas suit and had chosen not to file one or other questions of the standing of the purported 'next friend' were raised. Counsel continued to act 'on behalf of' detainees even in situations where detainees had refused to meet with counsel or authorize counsel to represent them. The system that developed under the prior protective order – a system that was driven by attorneys and purported 'next friends' rather than detainees – has proved unworkable or inappropriate in many respects, including being inconsistent with jurisdictional principles."

*Bismullah Motion for Entry of Protective Order, at 8, para. B.*

9.   This paragraph contains many extraordinary assertions. First, the military seeks to blame counsel for using 'next friends' preliminarily to assert the prisoners' rights, even though the military has held the prisoners effectively incommunicado for as long as five years. Second, the military asserts – with absolutely no basis – that counsel have somehow acted unethically by continuing to represent prisoners who 'refuse' (or decline) to meet with counsel. Third, the military asserts without any factual basis that the system has been 'unworkable', when the 'unworkable' aspect of the system is the denial of legal rights to the prisoners. Indeed, when it comes down to it, the only reason the military can come up with for disliking the system is that it is allegedly 'inconsistent with jurisdictional principles,' an assertion that is also mistaken.

A.   **The Herculean task of locating 'Next Friends' satisfactory to the Military, in the face of the Military's clear promise to the Prisoners**

10.   Like virtually all of the lawyers involved, I have worked on this project for five years without the government being willing to pay. None of my clients have been able to pay for representation, so that all the work has been done *pro bono*. The resources I have had available have been very limited. For the first two years, I was working full time as director of a capital trial office, with a full docket of capital cases.

11.   From the beginning, the U.S. military refused to cooperate in the most minor ways unless under court order or the threat of court order. For example, we asked the U.S. military to inform the clients that they were represented in court, but military refused even this meager measure. I learned from one of my British clients upon his release that they did not learn that they were represented for many months.

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

# EXHIBIT A

12. The U.S. Military has thrown roadblocks in the way all along. Of course, the most obvious example was the Military's refusal to allow prisoners to have lawyers at all until ordered by the Supreme Court to do so.

13. Thus, we had to begin by filing suit in the *Rasul* case, on February 19, 2002. It took almost two and a half years before the Supreme Court recognized the legal rights of the prisoners on June 28, 2004.

14. Once we prevailed on this litigation, we suggested to the military that one lawyer, or a small group, could come down and simply speak with each prisoner about whether he wanted legal assistance. That would have been simple and relatively convenient for everyone. The military would not allow this.

15. One condition we had to meet, then, was to obtain a next friend satisfactory to the military. This was a very complicated matter.

**Identifying the prisoners**

16. First, we did not know who the prisoners were, and the military would not give us a list of the prisoners in Guantanamo so that we knew who might like the assistance of counsel.

17. In coordination with other members of the group trying to assist the prisoners, I conducted a project over more than three years merely to identify the names of the prisoners in Guantanamo. The mere task of identifying the prisoners was like completing a very complicated jigsaw. There were over 750 prisoners brought to Guantanamo from roughly 50 countries, who spoke many languages. The only way that their names would come to light was if the home country published a list of their prisoners (provided presumably to the home government by the U.S.), or if the names would leak into the press from the families of the prisoners.

18. Only a small minority of the prisoners were nationals of European countries. The overwhelming majority were from other countries scattered around the world.

19. Most of these names came out in Arabic media, which made the work of identifying them that much harder. Often the name was misspelled in the Arabic newspaper to begin with, and then transliterated into English in a number of different ways. Thus, the task of sorting out the names of the prisoners was very difficult. Also, many foreign media outlets are not available on the internet.

20. There was a simple solution to our dilemma, if only the military would provide us with a complete list of detainees. This would allow us to build an accurate list of those who need legal services. However, the military refused to take this basic step. It is very difficult to see how, two or three years into the Guantanamo Bay experiment,

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

# EXHIBIT A

there could be any valid security concern that would bar everyone from operating off an accurate list.

21. However, it was not until May 15th, 2006 that the DOD was finally forced, through FOIA litigation, to produce a public list of all the prisoners.

**Additional Roadblocks in the way of Identifying the prisoners on the Base**

22. In earlier litigation, the Military suggested that demanding a more rigorous relationship between the prisoner and the next friend "would diminish the identification issues that have plagued the parties in the Guantanamo detainee litigation thus far." *Respondents' PNF Motion, at 14.*[1] This was not the cause of our problems. If the Military had allowed us to interview each prisoner as to whether they wanted counsel, all the problems would have been solved. The Military's own list of names (finally revealed on May 15, 2006) is not accurate in many respects. It is unreasonable for the Military to maintain their own inaccurate list and then blame us for failing to identify our clients by the (often erroneous) names that they are using.

23. In earlier litigation, the Military represented that they had yet to identify two dozen petitioners, *Respondents' PNF Motion, at 14*, and that there had been two counsel who went all the way to Guantanamo only to learn that the Military had incorrectly identified their petitioners. *Respondents' PNF Motion, at 14.* The Military sought, however, to imply that this is somehow the fault of the lawyers involved.

24. The fault, here, does not lie with Petitioners' counsel but with the Military's rules. The only consistent method by which we could identify prisoners was by their ISN, or prison number. However, the Military deemed the ISN to be classified FOUO ('For Official Use Only') until July 7, 2005.[2] This meant that we could not ask our clients for the ISN and then put it in a central list of all the prisoners to crosscheck it. Each time I would get an authorization from a prisoner, I had to edit the ISN out before I could remove the authorization from the secure facility and provide it to counsel for filing a petition. When that petition was then filed, without the ISN, it was correspondingly more difficult to make the proper identification.

25. As with so many matters, the Military's insistence on secrecy made no sense at all. The ISN is either a number (e.g., 000123) or a series of letters (e.g., JJJABC). The letters reflect the numbers (A=1, B=2, etc.). This series of letters (JJJABC) appeared on

---

[1] The government has filed various oppositions to Prisoner Next Friend filings. They are cited here solely by way of illustration of the inappropriateness of the government's argument.

[2] See *E-mail of Assistant Attorney General Andrew Warden* (July 7, 2005) ("After further consultation on the subject, the Department of Defense has determined for the purposes of this habeas litigation only that the pairing of a detainee's name and the 3, 4, or 5-digit ISN for the detainee is no longer classified or subject to treatment as protected information under the applicable protective orders.").

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

# EXHIBIT A

every piece of correspondence that the prisoner sent to his family, so the family knew the prisoner's ISN the moment they received mail. Indeed, they were required to put the ISN on their replies. Yet we were not allowed to keep the numbers on a central list. The problems, then, were caused by this unnecessary rule.

26. Classifying the ISN as FOUO made no sense, but made our task of identifying each prisoner to the Military's satisfaction much more difficult. If The Military complain, they must accept that they created this problem themselves.

27. The inaccuracy of the Military's own data would seem to also be the cause of misinformation that the Military has given to other governments about the prisoners in Guantanamo bay. For example, based on what the U.S. has told them, the British government maintained for many months that there were only five British residents in Guantanamo Bay – Shaker Aamer, Jamil al Banna, Bisher al Rawi, Omar Deghayes and Jamal Kiyemba. I represented them all, and initially relied on the British government's assertion that these were the sum total.

28. That reliance was misplaced. It turned out that there were many other British residents among the prisoners, including Binyam Mohamed, Ahmed Errachidi, Abdulnour Sameur, Ahmed Bel Bacha, Mohammad Al Qadir and Saiid Farhi. Mr. Errachidi had lived in Britain for 18 years. There are many such ways in which the information that the DOD has is incomplete or inaccurate.

**Given that we had to go to great lengths to facilitate securing counsel for the prisoners or their families, the DOD's allegations that lawyers have been 'soliciting' clients is hard to accept**

29. The DOD accuse volunteer counsel for the prisoners of "improperly abusing the next friend device in order merely to solicit the Guantanamo detainee population for clients. . . ." *Respondents' PNF Motion, at 14 n.11.*

30. To be accused of 'soliciting' clients – presumably with overtones of ethical impropriety -- is rather difficult to accept. Those of us who have been primarily responsible for securing authorizations from prisoners mainly work with two charities – my own (*Reprieve*) and the *Center for Constitutional Rights*. Virtually all of the other lawyers involved are working *pro bono* at great expense to themselves.

31. Speaking for myself, and I believe for the other lawyers involved in this effort, the effort made on behalf of the prisoners in Guantanamo Bay has been solely directed at ensuring that they have legal assistance available, and has been extremely expensive. No representative of any prisoner has paid me for the assistance rendered.

32. It must be borne in mind that the only reason we have to seek out any next friend for the prisoners is that the Military has held them effectively incommunicado in Guantanamo Bay.

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

# EXHIBIT A

### Finding Next Friends

33. As of June 2004, when the Supreme Court ruled in *Rasul*, we had identified fewer than one third of the prisoners being held in Guantanamo Bay, and the names that we had for some of these prisoners were very questionable. Having the names was only the first step. Very rarely did the media identify any way to contact the family or friends of a prisoner, and tracking them down in a country such as Yemen was never going to be easy if we were operating from the United States.

34. Because the prisoners were held effectively incommunicado, the next problem we faced was finding an adequate next friend.

### Prisoners' families desperately wanted legal assistance

35. As a primary matter, the prisoners' families have been desperate to provide assistance to their loved ones. Never, in all the time I have traveled on this mission since I first went to Paris in late 2003, have I met with members of a prisoner's family who did not want to sign an authorization for their loved one.

36. However, contacting the families in order to let them know of this option has been extraordinarily difficult. Furthermore, for obvious reasons, it is a great deal to expect a prisoner's family member in rural Yemen, for example, to have any idea how to find an American lawyer willing to take on the case of an indigent Yemeni prisoner.

37. Where families have tried to get legal assistance for their loved ones, the US authorities have intervened to make it more difficult. The tragic case of Binyam Mohamed illustrates this. Mr. Mohamed was a resident of the U.K., who had applied for political asylum from Ethiopia. His siblings all received asylum from the U.S., and are now U.S. nationals.

38. When Mr. Mohamed went missing from the world, his older brother and sister worked to try to find him. They wanted to locate him and, had they known he was in prison, they would definitely have wanted to get him legal counsel. However, an FBI Agent actively lied to them, telling them that Mr. Mohamed was not in US custody and that the U.S. did not know where he was. The agent, who left his card, was ███████████

39. This was false, as Mr. Mohamed had been rendered from Pakistan to Morocco in a US plane, where he underwent 18 months of horrendous abuse. Meanwhile, his brother traveled to England to try to find him. His sister distributed his picture as far afield as Pakistan, to no avail. He was 'missing' for more than two years, and they did not even learn he was in Guantanamo Bay until 2005, several months after he arrived there.

6.

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

# EXHIBIT A

40. Mr. Mohamed himself, when he finally reached Guantanamo Bay, tried all kinds of ways to get counsel. He asked other prisoners who had friends to ask them to contact lawyers. He got my address from another prisoner, and wrote to me – but it took months for the letter to get through. In the meantime, he also asked one of my clients to act as his next friend, and this is how I came to take up his case.

41. Mr. Mohamed is an educated person, who speaks English fluently, and who has even lived briefly in the United States. He has three siblings who live in the United States. Despite this, he found it impossible to achieve any meaningful access to the courts before a petition was filed for him by the next friend process.

42. In terms of finding Mr. Mohamed legal assistance, because they were American citizens and lived in the US, Mr. Mohamed's family were much better placed than the overwhelming majority of the families of prisoners. They could not achieve it because they did not know where he was. The fact that it proved so difficult to identify, locate and help an educated prisoner from England with family in the U.S. merely illustrates the immensity of the task when it comes to other countries.

**Identifying the Family members Abroad has been Extremely Difficult**

43. If it was difficult to identify prisoners' names, it was even more difficult to identify and contact the families. While the media might identify the names of some prisoners, very rarely did the media identify family members. Part of the reason for this was the reticence among family members to be identified publicly.

44. The problems for families contacting us were profound. First, they had to know that help was available, and there was no way that we were able to broadcast to families all over the world that they could contact us.

45. Second, they had to have a means to contact us, and the internet is not readily available to many people in a country such as Yemen.

46. Third, until we recently got an Arabic speaker in the office (in December 2006), they would have had to have contacted us in English to have any chance of making contact.

47. Indeed, I did not begin to receive an appreciable number of contacts from family members until after I had done some media with Al Jazeera to try to raise the profile of the issues. Even so, the families have found the process so difficult to understand, and making contact even more difficult, that I have received fewer than ten direct contacts from family members per year, when I have not traveled abroad to try to find them.

48. Even in the limited number of cases where family members have been able to establish contact in this way, it has been difficult to maintain consistent e-mail contact,

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

# EXHIBIT A

due to problems with the e-mail in places like Yemen. For example, I received the
following on July 31, 2005, at 11:12:27 PM GMT+01:00:

> Hi
>
> Thank you Mr clivess for your send.
>
> I am not spling english good sorry. ok i have may brother in coba
> goantnamo his name is tariek ali abdullah ahmad his from yamen.
> and i have may cazen his name mohamed abdullah mohamed al
> hemere. pls hilp hime and send me pls thank you very mash.
>
> Mr. Yaseer Ali Abdullah Ahmad

It has not been possible to get a signed statement from Mr. Ahmad – indeed, I have not
received a response to my follow-up e-mail. The inability to get back in touch with
family correspondents makes it very difficult to get meaningful authorizations via e-mail
or fax.

**Initially, the only way to make legal assistance available was to travel to Foreign
Countries to Secure Authorizations to Represent Prisoners**

49. The Military suggest that using 'friends' of the prisoners at Guantanamo is
unnecessary because there are other ways to achieve the same ends. *Respondents' PNF
Motion, at 13* (citing 5 such examples).

50. The implication is apparently that getting authorizations from family members
is a simple alternative. This is not the case. Over the years, I have been responsible for
filing various next friend petitions in capital cases in the United States, and on each
occasion the next friend has been available within the United States, generally within the
state where the petition has been filed. In contrast, with the prisoners in Guantanamo
Bay, the family members were spread over 50 countries.

51. I found early on in the process that the only realistic way to secure
authorization from family members was to travel to each country to secure it.

52. Given the lack of resources in our group, and a reasonable reticence on the
part of some to travel to countries that were potentially hostile to a United States citizen,
for many months I was the *only* volunteer counsel to travel around the Middle East
seeking out the prisoners' family members and friends, and asking whether they wanted
legal assistance. All of this had to be self-funded since Respondents opposed the
appointment and funding of counsel.

53. My first foreign trip (other than to Britain) was to Paris shortly before
Christmas 2003. I was then living in New Orleans, and made this trip during my
vacation. Through this, and other efforts, we were able to make contact with some of the

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

# EXHIBIT A

French prisoners' families. They had French lawyers, making the task easier. I had to pay for this trip myself with no realistic hope of reimbursement from any U.S. government source.

54. The European nationals constituted a small number of the prisoners, roughly twenty-two out of several hundred prisoners. Once we moved beyond Europe, the problem got much more difficult. There was the sheer size of the problem – there were reportedly about 350 prisoners from Afghanistan, Saudi Arabia, and Yemen combined, and many from various other countries outside Europe.

55. There was also a significant issue of cost. Some countries only had one or two prisoners, and it would be prohibitively costly to go there to try to locate their families.

56. I therefore first chose to visit Yemen, because it had a large number of prisoners. My first trip was to Sana'a, the capital of Yemen, in April 2004. Yemen is geographically quite large, and it is very poor. I visited the capital, but the prisoners' families were spread over the entire country. I had been warned prior to leaving that it could be dangerous to leave the capital and travel around the country. I would have been willing to risk it, but I had no way of knowing where the families and friends of the prisoners might be located.

57. Thus, I had to figure out a way to get the 'next friends' to come to Sana'a. To do this, I had to hold a press conference upon my arrival so that the local media would make it known that families could come to my hotel. Given the obstacles, I thought the trip a great success when 'next friends' for 31 prisoners came to the hotel where I was staying, or provided authorizations to a local human rights group. However, this expensive trip only netted authorizations for less than one third of the prisoners.

58. As of June 28, 2004, when the Supreme Court ruled in *Rasul*, my records reflect that we had authorizations for 45 'new' prisoners beyond those involved in the *Rasul* litigation: two of the remaining British nationals and two British refugees, three French, one Turkish resident of Germany, one Canadian, one Australian, one Syrian, three Algerians (who I had contacted through the Canadian wife of one of the Algerian prisoners), and 31 Yemenis.

59. In July 2004, I then went to Bahrain. Again, I had to find funding for this trip since there was no chance that the U.S. government would assist in this effort. With the help of local Human Rights advocates, and the father of one of the Kuwaiti prisoners, in the week I was there we secured 33 authorizations. These come from Bahrain (6), Jordan (3), Libya (2), Qatar (1), Saudi Arabia (19), Syria (1) and Yemen (1).

60. Again, this was an enormous amount of work. Again, we had to get information into the local media that I had come to Bahrain who could provide help to the prisoners, so that the friends and families would come to meet with me. I had to meet

9

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

**EXHIBIT A**

with various Bahraini government officials to ensure that the work would not be curtailed by the government.

61. So desperate were people to help the prisoners in Guantanamo that nineteen Saudis crossed the border into Bahrain, and two other people who wanted to help prisoners flew in from Qatar and the United Arab Emirates when they heard on al Jazeera of the efforts we were making.

62. I next went to Jordan in October, 2004. I had some concerns about going there because of its reputation as a repressive society. This was to prove prescient. When I arrived in Jordan, as usual I spoke with the media in order to get the word out to families and friends of the prisoners that I was there to offer help, since this was the only realistic way of making contact with the prisoners' families and friends. I mentioned that there was a dispute concerning the number of Jordanians in Guantanamo Bay, because my information indicated that there might be as many as 30. Some of these might be Palestinians, many of whom live in Jordan rather than the West Bank.

63. When this appeared in the Jordanian media, I had an Arabic translator who was kindly helping me without charging me anything, and we had given out her contact details in the media. She received more than one hostile call from someone purporting to be with Jordanian Secret Service. The person who called her gave an apparently false name (Abu Mataz) and a telephone number. "Abu Mataz" started demanding what she was doing with me, and made various scandalous and false accusations against her and me. He demanded that we appear at the Secret Police headquarters at 6pm that evening. Before going, I asked an associate to seek consular assistance if I have not returned in two hours.

64. The translator came with me. When we told the taxi driver that we wanted to go to the secret police HQ, he was very nervous and refused to take us to the gate. We had to walk the last part of the way, towards a well-defended building that housed the Secret Police. We were led into the white building, along a lengthy white corridor, with sporadic closed doors. It was nighttime, and totally silent. I will admit to being rather intimidated at this point.

65. We were taken into a room with two men. I introduced myself, and asked their names. One of them, apparently the most senior, said melodramatically, "We do not use names in this building."

66. I wrote a description of him during the meeting. He was about 45-50, short, balding, reddish hair, and wore a very large and expensive looking watch. He did not speak much English, apparently, though he appeared to understand a fair amount. I later described him to a local lawyer, who immediately identified him as Colonel Ali Borjak, who is Director of the Terrorism Department of the Jordanian Intelligence Service. I was told that he is notorious – rightly or wrongly – for having tortured Al Zarkawi when the latter was held in Jordanian custody.

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

**EXHIBIT A**

67. Col. Borjak demanded to know why I had said in the newspaper that there were 30 Jordanians in Guantanamo. We had a discussion about this, and he seemed not to believe that I would have come that distance to offer free legal assistance to these prisoners.

68. I told him that the Jordanian government was morally obligated to help me find the families and friends of the prisoners so that I could help them. Col. Borjak said that they did not know where most of the families are, and demanded that I share what I knew with him. This seemed improbable, given that he worked for the intelligence service. I was doubly nervous about his interest because the worst thing that could happen would be having the Jordanian Secret Police show up on the families' doorstep and intimidate them not to work with me.

69. We were kept at the Secret Police HQ for the best part of an hour. This intervention emphasized the problems we face trying to help prisoners who come from a repressive state like this. On that trip, for all this trouble and expense, I was eventually able to secure authorizations for only two additional prisoners, although I was also able to meet the three families in person who had made contact with me in Bahrain.

70. Since that time I have tried to travel to other countries as well. I have now been to Mauritania and Sudan trying to meet with prisoners' families. Other lawyers in my office have been to Morocco, Pakistan, and Tunisia. Other lawyers in our group have also been to Afghanistan, Bosnia and Kuwait. Yet all this travel (at great expense) accounts for a small minority of the countries represented by the prisoners in Guantanamo.

71. When we have traveled to countries like Yemen or Pakistan, there are so many prisoners spread over so much of the country that it is impossible to locate more than a proportion of the prisoners.

72. With other countries, like Mauritania, there are only three prisoners in Guantanamo, so it is a very expensive trip to try to locate fewer than one percent of the prisoners' families.

73. All such travel has come without any compensation from the US government or, certainly in my case, the prisoners' families. We have not had the resources to track down families in the large majority of the countries concerned.

**Foreign Government Interference with Access to Prisoners' Families**

74. When it comes to interference by foreign governments with our efforts to offer help to the families and friends of prisoners, Jordan is by no means the worst offender.

75. There are obvious examples of countries where one simply cannot imagine traveling there to meet with family members, either because I would not get a visa to go,

11

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

# EXHIBIT A

or because the families would be placed in jeopardy if I went. These would include Algeria, Chechnya, Egypt, Iran, Iraq, Kazakhstan, Libya, Saudi Arabia, Syria, Tajikistan, Turkestan, and Uzbekistan.

76. Saudi Arabia has been a good example of a country that has not only forbidden me from traveling there, but has also actively impeded our access to prisoners' families. It was on a trip to Yemen in 2004 that I met with six lawyers from Saudi Arabia, headed by Ahmad Maszar. They were designated by the Saudi authorities as the 'legal committee' assigned to 'help' the Saudi prisoners in Guantanamo Bay. In fact they have consistently obstructed us from assisting the prisoners.

77. I impressed upon Mr. Mazhar that it was very important to let the friends and families of the prisoners know that we could provide free legal assistance to them. I asked Mr. Mazhar if he could arrange a visa for me to come to Saudi Arabia to meet with family members. I said that I would come there at no cost to them, and find lawyers in the U.S. who would represent the prisoners at no cost. I said that alternatively the Saudi government could follow the lead of the Kuwaitis, and retain a firm they trusted in the U.S.

78. Mr. Mazhar promised to consult back in Saudi and get back in touch with me. I continually tried to contact him when I returned to the U.S., with no success. He consistently failed to reply to my messages.

79. On my Bahrain trip four months later, I prevailed upon Mr. Mazhar to come across the border so that I could continue in my efforts to persuade him, as the representative of the Saudi government, to cooperate in our efforts, at least by letting me come to Saudi and meet with people in the government and those who might be concerned about the prisoners. Again, Mr. Mazhar said that I would not be able to come to Saudi Arabia.

80. I learned that the families and friends of Saudi prisoners were being reassured that they did not need to do anything on behalf of the prisoners because Mr. Mazhar's committee was taking care of it. This actively prevented the Saudi prisoners from getting meaningful representation, although the Saudi 'committee' was doing nothing to assist the prisoners secure legal assistance.

81. In between my other responsibilities, these were the only trips that I was able to make up to October. I did go again to Jordan in November 2004, and Yemen in June 2005, but all of this travel cost a great deal of money, as well as time. The cost of these trips was over $5,000. By November, I had been able to secure authorizations for only 66 prisoners from family members, roughly one tenth of those in Guantanamo Bay at the time. At this rate, ensuring that all the prisoners had meaningful access to counsel was going to be prohibitively expensive, and unacceptably slow. There had to be another, more efficient way to get the prisoners the legal assistance that they so badly wanted.

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

# EXHIBIT A

82. However difficult it is to locate the family members, it should be emphasized that virtually every family wants to secure free legal assistance for their loved ones, thereby sharing a community of interest with the prisoner next friends we subsequently used. To this day I have never located a friend or family member of a prisoner in Guantanamo Bay who did not want legal assistance for the prisoner, although some people have been intimidated, thinking that they would incur the wrath of their home governments if they were seen to be working with a foreign lawyer. Many were incredulous that American lawyers would agree to provide this assistance without payment, and had to be convinced that we were for real.

**Ultimately, it became possible to Secure Authorizations from Guantanamo Bay, but the DOD would like to cut this avenue off**

83. In November 2004, I was able to visit clients in Guantanamo Bay for the first time. Both were British nationals, and it had been relatively easy for me to get authorizations from Britain as I am half British. My clients told me that other prisoners desperately wanted counsel and asked me how they could help.

84. By early 2005, there were still very few prisoners for whom there was authorization to file a petition, although I talked to my clients and learned that many were desperate to secure help. We had to search for a more reasonable way to deliver this assistance.

85. One of my clients showed me the English-language version of the Enemy Combatant Notice (ECN) that he had been given by the U.S. military. This gave us the idea of the way in which those of my clients could act as next friends for the other prisoners, thereby helping the other prisoners get the legal assistance they so desperately wanted.

86. To set this in context, the *Center for Constitutional Rights* (CCR) had been working to persuade the Military to agree to circulate a meaningful notice to the prisoners that would inform them that they could have lawyers, and that the lawyers would cost nothing.

87. The Military would not agree to this, and instead circulated their own ECN. This reads in pertinent part:

> You may ask a civilian judge to look at the lawfulness of your detention through a process called a *petition for a writ of habeas corpus*. You **may ask a friend** or family member or a lawyer to file such a petition with the court. If you do not have a lawyer or a family member **or a friend** who could file this petition for you, you may file your own petition.

13

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

**EXHIBIT A**

*Exhibit A* to *Declaration of Frank Sweigard* (italics in original; bold emphasis supplied).[3]

88. It should be noted that the Military did not begin to provide this notice to the prisoners until December 2004, roughly six months after the Supreme Court identified the prisoners' right to file for habeas corpus. *Declaration of Frank Sweigard, at ¶3.* Why this was delayed so long is not explained.

89. Interestingly, similar language is included in *Exhibit D* to the Military's current *Motion for Entry of Protective Order*, which provides:

> You may obtain such review by filing a petition for review
> under the Detainee Treatment Act in the court yourself.
> You can also ask a family member, **friend**, or lawyer to file
> a petition on your behalf.

(emphasis supplied)

90. Thus, every prisoner in Guantanamo should, at this stage, have been assured, probably on multiple occasions, that they can have any friend file a petition for them. I have discussed this language with some of my clients, and they have understood this to mean that they could file a request for legal assistance for their 'friends' in Guantanamo Bay.

91. The prisoners certainly have no way of having a lawyer act as next friend and most prisoners would rather have a fellow prisoner as 'next friend' than a family member. For example, one of my British resident clients, Jamal Kiyemba, has stated in an unclassified document that "[t]he prisoners want to know why they have to have a family member contacted on this. It's personal. They think this is just a way of dragging their families into this process, putting them at risk. This is particularly true when the family is in a repressive society back home. What is the point of having a family member involved?"

92. Based on this, various of my clients have wanted to act as next friends for other prisoners with whom they have become friendly while in the prison. I have asked them to be sure that the prisoners for whom they act desire legal assistance. (I refer to these prisoners as 'prisoner next friends.')

**There has been repeated Interference by the Military in securing access to Counsel**

---

[3] The identical language appears in the other 'Notifications'. *See Exhibits B & C* to *Declaration of Frank Sweigard.* For identical language in another similar form provided to the prisoners, *see also* Exhibit E, attached to *Declaration of First Lieutenant Wade M. Brown* (filed with *Respondent's PNF Motion*).

14

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

# EXHIBIT A

93. The Military's argument that the use of prisoner-next-friends should be restricted has been rejected by the District Court on more than one occasion. *Abu Imran v. Bush*, Civ. Action No. 05-764 (CKK)(AK), Order filed Feb. 9, 2007 at 2 (citing cases) ("The undersigned ... has already rejected Respondents' arguments many times over").

94. The most specific statement that the military has made on the matter is as follows:

> The system that developed under the prior protective order – a system that was driven by attorneys and purported 'next friends' rather than detainees – has proved unworkable or inappropriate in many respects, including being inconsistent with jurisdictional principles."

*Bismullah Motion for Entry of Protective Order, at 8, para. B.*

95. If the use of prisoner-next-friends (PNFs) is 'inappropriate' because it is "inconsistent with jurisdictional principles," the only assertion made, this is a difficult position to sustain.

96. First, one might well ask what the prejudice is to allowing prisoners to see a lawyer based on such a petition, especially given all the barriers that the military has erected to the prisoners' access to counsel. If the prisoner does not want legal assistance, all he has to do is say so. If he does, then his rights are vindicated.

97. Second, the military authored and circulated this notice, and now wants to reuse the same language in *Exhibit D*, specifically telling prisoners they can rely on 'friends'. For many months, the military allowed access to prisoners whose petitions had been filed by these PNFs. I personally secured scores of such PNF authorizations. I have visited many prisoners based on such petitions and, while there have been inevitable issues of trust, I have not had one prisoner who has *both* refused to meet with me *and* refused to allow me to represent him when I have relied on such petitions.

98. While I am certainly aware of some instances in which the prisoners have rejected the assistance of lawyers these have come when the prisoners' next friends have been family members, PNFs, and even after the prisoners have asked for counsel themselves. In short, there are many reasons why a prisoner may have qualms about his lawyer (most of which are privileged, and many of which are later resolved).

99. There is not currently accurate data on the precise number of prisoners who have seen counsel based on PNFs. However, there are dozens of such cases.

100. I secured the first PNF authorizations in early 2005. The military did not, to my knowledge, challenge a PNF authorization for lack for standing for many months.

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

# EXHIBIT A

101.    Having allowed visits based on PNFs for so long, there is a serious equal protection problem for the military to change horses and argue that such petitions are not adequate.

102.    This is particularly so given the promise that the military has made in these notices. How can the military say that any friend can file the document, and then argue that 'friends' in Guantanamo Bay cannot file a next friend petition? Indeed, under the ECN, the prisoner is not told that his first alternative is to file a petition himself: The default alternative is to have a friend file a petition, and only if there is no available friend is the prisoner told that he 'may' file a petition on his own. Therefore, from the prisoners' perspective, this is not an issue of whether another prisoner may act as 'next friend' – but simply whether the U.S. Military is going to be held to its promise.

103.    It is unrealistic – and, given that the Military are holding our clients incommunicado, unreasonable – for the Military to pretend that the prisoners can easily secure the legal assistance they desired.

104.    The military has taken other steps to curtail access to lawyers. For example, on one of my visits to Guantanamo, at 3:35pm on May 3, 2005, I was at Camp Echo talking to Lt. Col. ▮▮▮▮▮ (of the SJA office) when a man (ISN 111) who was in the exercise cage shouted to me to ask whether I was a lawyer. Col. ▮▮▮▮▮ allowed me to speak to him, and he said that he "desperately want[ed] a lawyer". He said he had been in Camp Echo for months and had not been able to get counsel. I had this information unclassified so that I could execute my own statement as the basis for filing a petition for a writ of habeas corpus on his behalf.

105.    However, new rules were then put in place forbidding any contact at all between the prisoners in Camp Echo and the lawyers, save for the specific visitation time. Therefore, this avenue for prisoners to secure assistance was cut off.

106.    Not only is it difficult for prisoners to get help in Camp Echo, but the Military make it very difficult for them even to have a friend in the prison to file on their behalf. As my client Jamal Kiyemba noted, "many prisoners are held under circumstances under which they cannot talk to any 'friend.' For example, in Camp Echo, there is no talking to any other punishment, or you are punished. . . ." Similar rules have been applied to prisoners in India Block and elsewhere. Those who are being punished most harshly, who might most need counsel, face additional hurdles.

## The special problems of Camp V & VI and Disciplinary and Segregation Level prisoners

107.    The prisoners in Camp V and Camp VI, and those who have been held in restrictive custody of other kinds, face other problems. Camp V can house up to 100 prisoners, and Camp VI can house as many as 174. Thus, between them the two camps can house a majority of the prisoners at the institution.

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

# EXHIBIT A

108.    Camp V and VI prisoners are held in solitary confinement and have nobody who can help them to write documents to counsel.  More important, some of those in Camp V and VI, and virtually all those in restrictive levels, are not allowed pen and paper.  The Military suggest that "Detainees are supplied pens, paper and envelopes regularly. . . ." *Respondents' PNF Motion, at 7 n.4.*

109.    The most recent proposed Protective Order states that "Detainees will be provided with paper to prepare legal mail communications to counsel." *Proposed Protective Order, at 40, para. B(i).*  Notably, this does not require that the prisoners be given pens with which to write on the paper.

110.    For many prisoners, it is just not true that they are regularly allowed pen and paper in a manner that allows for proper communication.

111.    According to the unclassified information that I have secured from my clients, "particularly with levels 3 & 4 [disciplinary and segregation prisoners], the lack of pen and paper make it very difficult for prisoners to work with counsel."  This has been confirmed by my own experience.

112.    With many prisoners in the other categories, my clients report that they are allowed a pen for just half an hour every two weeks.

113.    Evidence of this restrictive attitude to writing does not come from just my clients.  On one trip, I asked that the Sergeant at Camp Echo to give my client a pen and paper so he could write materials for me overnight, as I was going to see him again the next day.  The Sergeant said that the prisoners could not have a pen except when I was present with them.  Clearly, it is impossible for prisoners to have meaningful legal access without a pen.

**Military Interference with the Relationship between Prisoners and Counsel**

114.    One issue raised by the Military is whether PNFs have a community of interest with the other prisoners such as to justify their acting as 'next friends.'  It is very hard to see how any rational person would not want assistance in vindicating his rights.  To the limited extent that some prisoners are mistrustful of American lawyers who volunteer to help them, this is almost exclusively attributable to the manipulative strategies adopted by the Military and their personnel.

115.    It should always be remembered that the Military could easily have solved all of these problems.  All the Military had to do was allow an independent person to speak to each prisoner and ask him whether he would like counsel, and we would have secured counsel for everyone who wanted it.  Instead, the process of getting the prisoners the help they want has been incredibly convoluted.

116.    Far from making counsel available, the Military have tried to prevent the prisoners from trusting counsel. Some of the prisoners have been manipulated by the

17

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

# EXHIBIT A

Military into thinking that the lawyers are yet another part of the Guantanamo deception. There has been extremely troubling interference with the right to counsel, with the Military discouraging prisoners from attending legal meetings. For example, when I have been to Guantanamo Bay, I meet with prisoners at Camp Echo, which used to be a punitive camp, and continues to be an isolation camp. When there, the prisoners are held in solitary confinement, are not allowed a shower every day, cannot have collective prayer, and are only allowed out briefly once or twice a week. I am required to provide the Military with a schedule for my visits, so the Military are on notice when people need to be there. Yet the military has sometimes made a practice of taking the prisoners over there long before they are needed.

117.    As one of my clients, Jamal Kiyemba, has explained in unclassified materials:

> "Camp Echo is the most lonely place on earth. Last time I had a legal visit, I was all alone for ten days. They brought me over there, they would not let me take my Koran, and they put me in an isolation cell with nothing. There is no way to talk to any other prisoner, you're not meant to talk to the guards. There is a camera and microphones in the cell to make sure this is obeyed. The camera seems to shrink the cell, and make you paranoid. * * * There is no communal prayer. Showers and recreation were greatly limited – I got to go into the outside cell once for half an hour in six days, and got one shower. In [Camp] Delta I get outside [e]very day, and have a shower every day. If I complain [about Camp Echo], I am told that it is the lawyer's fault. If I did not have to come for a legal visit, I would not be treated like this."

118.    I kept a log of when my clients were brought over to Camp Echo for visits, and when they left after my visit. When I was in Guantanamo in May 2005, two of my clients were brought over to Camp Echo five days before my scheduled meeting, one eight days early and one *eleven* days early. I learned on my subsequent trip that one of my clients was held in solitary confinement in Camp Echo for *eleven* days after I met with him. There is no imaginable security reason for this; however, it was a huge imposition on my clients' right to meet with their clients.

119.    Gradually, the military has made visits more frustrating and less productive. I travel roughly 4,000 miles for each visit, and I do not come for any purpose other than to work. We – lawyers and military alike – are all stuck on Cuba and it is very little inconvenience for the military to lock the lawyers in a cell for the whole day with the clients.

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

# EXHIBIT A

120.    When I first would come, I was allowed to work 7 days a week, from 8am to 5pm each day, with no break.  In other words, I could work 63 hours in a week, and get much more done on behalf of my many clients.

121.    Gradually, the military cut back on what could and could not be done. The military refused to let us come to the camp until 9 a.m., which meant that we rarely began work until 9.30 a.m. at the earliest.  The military required us to leave at 11.30 a.m. and not come back until 1.00 p.m. or 1.30 p.m., which meant that we might not get in until 2 p.m.  We then had to leave by 4.30 p.m.  The military barred any weekend visits. I kept notes on all my visitation, and in December 2006, I visited the prison for 8 days, in which time I was able to spend 17 hours and 25 minutes with my clients, rather than the 72 hours I would have had under the old rules – a loss of more than 75% of the work time.

122.    This is all unnecessary, created by bureaucratic rules that are clearly not required for security purposes.  For example, while on one occasion a former SJA insisted that the rule about my not working through lunch was mandated by the SOG (Sergeant of the Guard in charge of Camp Echo), I spoke with the SOG himself, and he apologized to me, saying it would actually be easier on him to let me stay through lunch as he would not need to move me or my client.  Indeed, because of the good graces of the SJA on my most recent trip, I was allowed to work through lunch and did somewhat better – thereby illustrating how unnecessary the restrictions had been.

123.    There have also been other consistent and troubling steps taken by the Military to frustrate the right to counsel.  On a basic level, the prisoners have a hard time believing that the lawyers are for real because (due to the Military's opposition to counsel visiting) it took almost three years for them to begin to come to the prison.  How, the prisoners ask, can this be a legitimate legal system if the lawyers did not come all that time?  It strikes the prisoners as more likely that the lawyers are simply the next devious step in the interrogation system.

124.    This impression is greatly enhanced by the Military's deceitful practices. My unclassified notes reflect that several prisoners have told me that investigators have impersonated lawyers in an effort to get prisoners to talk.  More recently, a prisoner who had been a juvenile, Mohammed el Gharani, explained to me how the interrogator had boasted about her experience in the U.S. Supreme Court and what she was going to do for the young man.  Naturally, when they learn that these 'lawyers' are actually interrogators, this makes the prisoners loath to believe that we are really lawyers on their side.

125.    The interrogators consistently tell prisoners that the lawyer's advice is wrong, that having a lawyer is harmful, and that if the prisoner has a lawyer that makes it less likely that the prisoner will get out.

126.    The military has taken other steps that are simply outrageous.  On one of my visits to my clients, one of my clients, Shaker Aamer, said accusingly to me that I was Jewish.  It turned out that his interrogator had said this to him, apparently trying to drive

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

# EXHIBIT A

a wedge between the prisoners and the lawyers, based on the prisoners' presumed antipathy towards Israel and Judaism. I have not been the only lawyer who has been the object of this racist strategy by the U.S. military.

127.    On another occasion I was talking to Osama abu Kabir, one of my Jordanian clients, and he said that the interrogators were telling the men something very embarrassing about me. He finally came out with it: They were telling the prisoners that I "liked having sex with men," hoping to play upon the presumed homophobia of conservative Muslim prisoners. I was forced to deny this (not that sexual orientation should be relevant in any way to a lawyer's task), and spend some time trying to repair the damage done.

128.    Meanwhile, the military says that the attorney-client discussions are confidential, but not one prisoner believes it. There have been suggestions that the Military does monitor supposedly privileged hearings. For example, this apparently happened in the case of Mamduh Habib, who was apparently interrogated about what he had discussed with his lawyer, Joe Margulies, when Mr. Margulies left the visit. With my clients, even if the Military was not listening in to the discussions, the Military tried to interrogate prisoners about what they discussed with me as their lawyer.

129.    As one prisoner said:

> "We all know that everything we say in these rooms is
> being monitored by them, and every time we say that we
> particularly hated being treated in a particular way, we
> know that this will later be used against us. There are
> constant examples of this. Last time my lawyer was here, I
> told him that I did not like being spoken to by my ISN
> number all the time, because it was so dehumanizing.  * * *
> When I got back to my cell, they suddenly started doing
> this a whole lot more. And other things I just don't want to
> mention."

Regardless of whether the Military does violate the order of the court, the prisoners all believe they do -- a belief based on the consistent deceit and manipulation that the Military has practiced.

130.    The requirement that everything said to counsel has to be subjected to review before counsel can speak publicly about it is also a basis for creating mistrust with the prisoners. As Jamal Kiyemba said to me, "[w]hat am I meant to think of my Attorney-Client Privilege when everything that is in the privilege is being 'reviewed'?"

131.    At the same time, even the current classification rules make the prisoners far less involved in their own cases than they would be in a normal case. The prohibition against prisoners knowing facts about their cases is one part of the problem. I obviously cannot write about classified evidence here, but I can say that I have seen classified

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

**EXHIBIT A**

returns in some of my cases. I have yet to see anything in there that would be deemed classified under a rational system. To be sure, the military may not *want* the prisoner or the public to know the highly dubious source of the 'evidence' against him but this is a situation faced in criminal cases every day, when the government must disclose the name of an informant so that the informant's reliability can be tested. Why should that be different in the context of these cases?

132.    It makes it very difficult to represent a prisoner in any meaningful way when the lawyer knows that the case against the prisoner is highly unreliable, yet cannot discuss these facts with the prisoner.

133.    It also makes no sense that we, as lawyers, are not allowed to secure letters from our clients to take to their families that would provide us with an introduction and help us to establish trust when we travel abroad to work on the case. Such letters would pass through the censorship process, so there would be no danger to national security. Yet it is a narrow and inappropriate interpretation of the lawyer's role to assert by fiat that such letters (and other similar documents) cannot be part of the attorney-client process.

134.    These kinds of limitations stem from the Military's misunderstanding of the lawyer's role, a misunderstanding that is magnified in the most recent documents submitted to this court.

**The Military's Inadequate Descriptions of Legal Rights**

135.    The military suggests, via the declaration of Frank Sweigart, that they have "notified each detainee at Guantanamo Bay of his right to file a petition for habeas corpus, and has provided each detainee with the address of the United States District Court in the event that he desires to submit his own petition to the Court." *Respondents' PNF Motion, at 7.*

136.    It would be inappropriate to rely on the Enemy Combatant Notification as sufficient to ensure that the prisoners will get the legal assistance that they need. To my knowledge, not one prisoner has thus far secured counsel through a 'petition' filed as a result of the ECN notice.

137.    The prisoners are not even consistently allowed a copy of the ECN to study. For example, according to reports of my clients that have been unclassified, Omar Deghayes was not allowed to have a copy of the form, while Jamal Kiyemba was allowed it briefly, and Shaker Aamer was able to keep his copy.

138.    The ECN states that the Assisting Military Officer (AMO) will help the prisoner to understand his right to file for habeas corpus. ("Please talk to your Assisting Military Officer if you have any questions about this notification. Your Assisting Military Officer will meet with you later."). However, in my experience this is simply not done – certainly not on any systematic level.

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

# EXHIBIT A

139.    None of my clients have ever heard of an AMO. They have heard of a Personal Representative (PR). Yet, setting aside the ethical propriety of the Military encouraging non-lawyers to provide legal advice to prisoners, the PR's have provided inadequate 'advice' in the cases with which I am familiar.

140.    Omar Deghayes received only one visit from a PR (with respect to the CSRT), and he received no meaningful assistance. Mr. Deghayes thought the PR was an interrogator (he was even told he had a "Reservation," the euphemism for interrogation), the PR would not give Omar his name, would not have his handcuffs taken off, only met with him for about ten minutes total, and did not tell him until well into the meeting that he was the PR. *See First Supplement to Petition for Writ of Habeas Corpus (Deghayes et all. v. Bush), at 4-5 (filed April 1, 2005)*. Such advice as Mr. Deghayes sought was not given. The PR did not, or would not, tell him whether there as any point attending the CSRT (i.e., whether anyone was being found not to be an Enemy Combatant), what kind of tribunal it would be, or how he might secure witnesses. *Id. at 5*. Neither could Mr. Deghayes get an answer as to how he could file a statement or secure witnesses when (as a Level 3 or 4 prisoner) he could not have a pen and paper.

141.    In another instance, Shaker Aamer had one meeting with a PR, and that was prior to his CSRT. His PR told him:

> "I'm not a lawyer. I'm more of a middle man. I'm not
> here to help you. I cannot give you any advice. I'm jus
> here to take what you want to send to the [CSR] tribunal."

142.    According to Jamal Kiyemba when, prior to my being able to visit him, he asked for help understanding the habeas process, he found that "the advice is incomprehensible. The officers [PR/AMO] who are meant to explain the habeas corpus process to us do not know."

143.    The prisoners' reasonable mistrust of the military 'assistance' is well illustrated by the experience of Sami al Haj, my Al Jazeera client. Mr. al Haj had a military officer who appeared at his CSRT as the PR. Some months later, the same man appeared at Mr. al Haj's ARB (somewhat shamefaced, according to my client) in the role of prosecutor. Under circumstances such as these, how can any of the prisoners believe what they are being told?

144.    Since meeting with my clients, I have instructed them to request to meet with the PR/AMO on a regular basis as they have to present a meaningful case to their ARB. I provided my clients with a list of suggested questions that they might ask about the ARB, as well as the habeas process. To my knowledge, to date, no PR/AMO has responded to the request of *any* of my clients for a meeting, let alone to provide this information.

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

# EXHIBIT A

**Problems stemming from the different cultures and languages of the prisoners**

145.    There are many problematic issues of translation in Guantanamo Bay. The ECN explanation is apparently one such issue. Some prisoners who are bi-lingual and have seen the ECN in both English and Arabic. They say that the ECN is hard to understand even in English, but even harder in Arabic.

146.    The prisoners are told that they "may ask a civilian judge to look at the lawfulness of your detention through a process called a *petition for a writ of habeas corpus.*" (emphasis in original). Some months ago, a very sophisticated graduate of Oxford University asked me what a "writ of habeas corpus" actually was, and what it meant to file a petition. If an educated person steeped in the culture of a country with the Anglo-American habeas system does not understand the process, it is far from evident that someone without the benefit of an Oxford education from a country with a wholly different legal system will do so.

147.    To tell a prisoner that a civilian judge will "look at the lawfulness of your detention" hardly informs the prisoner what he needs to know. Indeed, my various clients insisted to me that they wanted to act as next friends to other prisoners, because they felt that a prisoner from a Middle East country who did not speak English would face great problems seeking legal assistance on his own.

148.    We face the same problems with the new submission by the military. Most of us as lawyers have no idea what the military thinks we will, and will not, be allowed to contest under the DTA. How should the clients know from what they are being told?

**Checks already in Place if Prisoners decide they do not Want Lawyers**

149.    There should be no concern that the prisoner is going to be provided with counsel when he does not want it. There is already a system in place should the prisoner decide he does not want a lawyer. The U.S. military requires that, by the second time that counsel visits, counsel secures an "Acknowledgement of Representation" form, signed by the prisoner.

This form is already a considerable burden on the right to counsel, since many of the prisoners are very worried about signing anything.

## II. The U.S. Military's Desire for Still More Censorship

150.    Commander Patrick McCarthy makes various unsupported allegations in his affidavit in support of the new protective order in the Court of Appeals, which illustrate that there will be considerable dispute before that order can be entered. While it is very difficult to respond fully when he does not identify the source of his concern, I will do the best I can.

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

**EXHIBIT A**

151.    It should be remembered that the purpose of classification review is to prevent the dissemination of material that is a *threat to U.S. national security*. It is not designed to impose the U.S. Military's philosophical beliefs upon prisoners' lawyers.

**The Limits to Cmdr. McCarthy's knowledge**

152.    Cmdr. McCarthy has only been in his job since May 2, 2006, roughly one year. He made his affidavit on August 25, 2006, when he had been in his position less than four months. He is therefore depending upon institutional hearsay 'knowledge' for some (but not all) of what he represents. The base has been open for more than five years and habeas counsel have been visiting Guantanamo Bay for almost three years. I have myself been visiting since November 2004, and I have some knowledge of various issues that he raises.

153.    Not long after Cmdr. McCarthy arrived at Guantanamo, the military personnel who were searching lawyers began to interpret the rules very differently to their predecessors. These interpretations varied from the unnecessarily restrictive to the absurd. For example,

154.    I have been instructed by U.S. military personnel in the SJA's office that it is inappropriate to refer my clients as prisoners, and that I should refer to them as "detainees".

155.    Cmdr. McCarthy speaks of a 'book' on torture and Abu Ghraib confiscated on January 24, 2006. *McCarthy Affidavit* ¶4. I do not know the report of which he writes, but it is difficult to pretend that U.S. practices of torture and abuse are not "directly relevant" to the lawyers' representation of the prisoners. On the other hand, I have often taken books and magazines myself to the base, not to give to my clients directly, but to submit to the military for clearance so that they could be given to the clients. The idea -- shared by other lawyers – is that we can help the military by providing interesting materials for the clients to read, thereby taking their minds off they misery of their situation, and helping everyone to make the prison more tolerable.

156.    I have kept incomplete records on the books and magazines that have been censored and kept from the prisoners, and this list illustrates the bizarre and irrational way in which the military assesses what is, and is not, a threat to national security.

157.    Banned books have included various books that have dealt with issues of racial discrimination. For example, my clients were not allowed to receive *The African American Slave* by Frederick Douglass, or *Uncle Tom's Cabin*. It is hard to see why these would be banned for security purposes, although it is easy to see that an Un-American approach to censorship would exclude anything that might be viewed as critical of the United States in any way.

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

# EXHIBIT A

158.    I took an anthology of World War One poetry that was all about the horror and futility of war – indeed, it included one of my own favorites, Wilfred Owen's poem *Futility*. That was banned.

159.    Omar Deghayes is one of my clients and he studied law in Britain, where he was a refugee. He had trying to qualify as a lawyer shortly before traveling (and ending up in Guantanamo). I thought it would make sense to have him study while in prison, to make the most of his time there. Guantanamo officials have periodically stated that there are plenty of "rehabilitation" opportunities in Guantanamo and, while I have found this to be far from the truth, there could be few things more positive than studying the importance of the rule of law. So I brought the British law books that he needed to study. These were banned.

160.    Indeed, Omar is something of a celebrity in Britain, because there is strong evidence of his innocence. Various British authors sent books to him through me. *New Statesman* Editor John Kampfner gave me a signed copy of his book *Blair's Wars* for Omar. Clare Short MP (a former cabinet minister under Mr. Blair) signed a copy of *An Honourable Deception: New Labour, Iraq and the Misuse of Power*, with a dedication: "Hope you will be back with us soon Omar, Best Wishes, Clare Short MP." George Galloway MP also wrote a dedication in his book, *I'm Not the Only One*: "Omar, with Maximum Respect, George Galloway, MP." I also had a signed copy of John Pilger's book, *Hidden Agendas*, which I gave to the censors for Omar. None made it through. With Pilger's book, written in 1998, there were very few references to Islam beyond a comment that most innocent victims of violence had been Muslim at the time (a fact that probably remains true today).

161.    With the other books, one might understand why the U.S. military would not *like* the book, or would rather people read something that was more favorable to the foreign policy ventures that the Bush administration has taken around the world. However, this does not serve as an excuse to ban a book as a threat to national security.

162.    Banned magazines that I have submitted have included *Runner's World* as well as various other seemingly harmless publications.

163.    The Australian prisoner in Guantánamo, David Hicks, was banned from reading Scott Turow's legal thriller *Presumed Innocent* as well as *The New Dinkum Aussie Dictionary*.

164.    Perhaps the strangest decision involved four books that another lawyer submitted, each of which was returned with the notation, "These Items were not Cleared for Delivery to the Detainee(s)". They were *Puss in Boots, Cinderella, Jack And the Beanstalk* and *Beauty and the Beast*, in Arabic translation. Banning them illustrates censorhip run amok.

165.    Cmdr. McCarthy speaks of problems associated with the lack of screening of legal mail for "content contraband." *McCarthy Affidavit* ¶5. Personally, I would

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

# EXHIBIT A

welcome an honest and responsible screening of content, because it would solve problems that would arise in differing interpretations of the rules. However, the current interpretation of the rules by Cmdr. McCarthy's staff is so absurdly restrictive that it would be totally impractical. At one point, the military personnel refused to allow counsel, in my presence, to take a copy of the Supreme Court *Hamdan* decision in to the clients, because it was not in their name. That issue got resolved, but very, very restrictive interpretations of what is legal material are still applied, somewhat at random.

166.    Around "March 31, 2006, another attorney gave his detainee client a copy of a speech given at an Amnesty International Conference without sending it through the non-legal mail review processes." *McCarthy Affidavit* ¶5. As I understand it, this was a speech given as part of that prisoner's case – the prisoner being Jamil el Banna (ISN 905), and the lawyer being my co-counsel, Brent Mickum. This was "directly related" to Mr. el Banna's case.

167.    There is an allegation about attorneys taking tape recorders down to the base at the request of a radio station. I have no knowledge about this. However, Cmdr. McCarthy states that "[n]o pictures taken by attorneys were cleared to leave the base." *McCarthy Affidavit* ¶7. Certainly as a general matter this is not true. The following is a cursory history of the permissible use of cameras on the base by the lawyers:

a.  When I first went to the base in November 2004, we were explicitly allowed to bring cameras, even onto the Windward side. The only limitations were that we had to turn the cameras over to our escorts when we crossed the security line on the way to the client visits, and that we were not allowed to take pictures of the hill on the western end of the Windward side.[4] There were no limitations placed on pictures taken on the Leeward side. I took several pictures and have never had any complaint from anyone about them. One is on the cover of my book.

b.  Several months later the Escorts asked us not to bring cameras to the Windward side, but there was not prohibition on cameras on the Leeward side.

c.  Someone associated with a legal team then published a picture in the Washington Post that included one of the Escorts. This upset the authorities, although it is hard to see how it was a threat to anyone – the notion that the Escort would be placed in danger by this is unrealistic. The Escort was very friendly and the legal teams visiting were generally positive about him.

---

[4] On New Year's Eve 2005-06 I had a conversation with one of the officers in charge of conveying the media around the base. He asked me not to use his name publicly but I would be glad to discuss this fully at a proper evidentiary hearing. He was complaining to me about how fatuous the rules limiting the pictures that the media could take of the Windward side of the base.

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

# EXHIBIT A

168.    There are many other matters with which we will take issue in the Court of Appeals. I discuss these briefly here simply to demonstrate that there is a very real dispute that may take a while to resolve. Hence the need to maintain the status quo.

### Background of Declarant

169.    For informational purposes, I will provide a limited resume of my experience in this area.

170.    I received my *Juris Doctor*, Columbia Law School, in 1984, and I was recognized as a Harlan Fiske Stone Merit Scholar all three years I was there. My previous degree was from the University of North Carolina at Chapel Hill, where I was a John Motley Morehead Scholar from 1978-81. I had completed my British education at Radley College, near Oxford where I received A levels in Physics, Chemistry, Mathematics, and Further Mathematics.

171.    Before turning to the Guantanamo Bay cases effectively full time, I was Director of the *Louisiana Crisis Assistance Center*, for almost eleven years from July 1993 to March 2004). The *LCAC* is a not-for-profit law foundation devoted to providing legal services to indigent persons facing the death penalty in the South. I had previously spent nine years as a staff attorney with the Southern Center for Human Rights in Atlanta, Georgia.

*172.*    Over the years, I have been counsel in many very serious criminal cases (mostly capital cases) at all levels of the process, from trial to the United States Supreme Court. I have tried more than two dozen capital cases to a jury, and been involved in many more cases that did not proceed to trial. I have been involved as counsel in dozens of capital appeals, and more capital cases in post-conviction and habeas review. I have been responsible for securing certiorari review in the United States Supreme Court in various cases, including *Johnson v. Mississippi*, 108 S. Ct. 1981 (1988) (unanimous reversal of death sentence for improper consideration of invalid prior conviction); *Shell v. Mississippi*, 111 S. Ct. 313 (1990) (unanimous *per cuiam* reversal of death sentence for invalid consideration of aggravating circumstance); *Minnick v. Mississippi*, 112 L. Ed. 2d 489 (1990) (reversal of conviction for violation of the Fifth Amendment right to counsel); *Lonchar v. Thomas*, 116 S. Ct. 1293 (1996) (certiorari granted moments before petitioner's scheduled execution, resulting in unanimous decision in favor of the death sentenced inmate). In each case where there was argument I asked another counsel to argue the case, so that I could focus on the capital trials that I was then responsible for.

173.    I was one of the counsel involved in the initial litigation of the case that eventually became *Rasul v. Bush* (June 28, 2004) (availability of judicial review for prisoners in Guantanamo Bay).

174.    Because of the importance of effective counsel in a meaningful judicial system, I have taken a very active role in systematic litigation on behalf of the right to

27

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

**EXHIBIT A**

counsel. This has included a class action on the right to counsel in capital post-conviction in Mississippi, and a large amount of litigation on the need for adequate funding and caseload limits in Louisiana.

175.   I have taught many legal education programs on a variety of scientific subjects in Arizona, California, the District of Columbia, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Massachusetts, Mississippi, New Mexico, New York, North Carolina, Ohio, Tennessee, Texas, and Virginia.

176.   I have twice been invited to testify before the United States Congress, Sub-Committee on the Judiciary, regarding racial discrimination in capital cases.

177.   I was a member and staff counsel to the *Commission on Human Rights Abuses in Mississippi* (Jackson, Ms., 1993).

178.   In 2000, I was honored by Her Majesty Queen Elizabeth II with the *Order of the British Empire* (OBE) for services to humanity. For work for indigent persons who could not afford counsel, I received an Honorary LLM Degree, from the University of Wolverhampton, England in 2001, and a *Lifetime Achievement Award*, from *The Lawyer Magazine* (UK April 2003), and *The Law Society* (U.K. Oct. 2003).

179.   I have been author or co-author of various manuals on the effective representation of indigent persons facing serious criminal or capital charges in Louisiana (1987, 1994 eds.), Mississippi (four editions, most recently in 1991) and Georgia (two editions).

180.   I have co-authored various law review articles, the most relevant perhaps being Paduano & Stafford Smith, *The Unconscionability of Sub-Minimum Wages Paid Appointed Counsel in Capital Cases*, 43 Rutgers L. Rev. 281 (1991).

181.   I was a Soros Senior Fellow, courtesy of the Open Society Institute, for 2004-05, and have now been awarded a Rowntree Visionary grant for five years to do this charitable work. I had been working on the Guantanamo Bay issues part time even before this, but I resigned as director of the LCAC in August 2004 to devote my time more extensively to trying to help the prisoners in Guantanamo Bay, because I believe passionately that if we are going to preserve our standing as proponents of human rights, as Americans we must show that we mean what we say, and adhere to the rule of law in the most difficult cases, as well as the easiest. My main role in that position has been to work to ensure that prisoners in Guantanamo Bay were able to get counsel, and effective representation. I have assumed this role solely because the work so obviously needed to be done. I must stress at every turn, however, that my resources are wholly inadequate for the purpose.

182.   I am now based in the United Kingdom. I have dual US and UK nationality.

28

Approved By DoD For Public Filing
Protected Information redacted
May 15, 2007

**EXHIBIT A**

### Conclusion

THE FOREGOING is executed under the penalties of perjury, constitutes a true and accurate account of what I know, and does not exhaust the sum of my knowledge.

Done this 2nd day of May, 2007, in Bridport, England.

_____
CLIVE A. STAFFORD SMITH